United States District Court
Southern District of Texas
**ENTERED**
September 14, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | **Criminal Case No. 2:20-cr-01223** |
| | § | |
| SEAN GRISS | § | |
| CLEOFAS MOLINA | § | |
| JUAN CERVANTES | § | |

## MEMORANDUM OPINION AND ORDER

Defendants Sean Griss, Cleofas Molina, and Juan Cervantes are under indictment for conspiring to possess cocaine with intent to distribute.[1] (Dkt. No. 1). Pending before the Court are three Motions to Suppress—one filed by each defendant. (Dkt. No. 46); (Dkt. No. 53); (Dkt. No. 72). The Government filed its Response, (Dkt. No. 73), and the Court held two evidentiary hearings. *See* (Dkt. No. 91). The Parties have also filed supplemental briefing. (Dkt. No. 87); (Dkt. No. 93); (Dkt. No. 95); (Dkt. No. 96). After reviewing the Motions, the Response and Supplemental Briefing, the record, and the applicable law, the Court **DENIES** the Defendants' Motions.[2]

---

[1] 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B).

[2] Cervantes argues he was in custody and should have received *Miranda* warnings before he was questioned. (Dkt. No. 72 at 6–10). During the May 13, 2021 suppression hearing, the Court asked whether it was appropriate to defer a ruling on any post-*Miranda* statements. (Dkt. No. 91 at 18). Counsel for Cervantes responded that the statements would be a trial issue raised through a motion in limine. (*Id.* at 20–21). The Government stated that it intended to use post-*Miranda* statements only on rebuttal at trial. (*Id.* at 18). At the reopened suppression hearing on July 8, 2021, the Parties agreed that no pre-*Miranda* statements made by any Defendant will be offered at trial. Thus, the Court does not address Cervantes's argument in his initial motion to suppress regarding alleged *Miranda* violations.

## I.     BACKGROUND

### A.     FINDINGS OF FACT[3]

Griss was arrested in an unrelated case on June 18, 2020.  (Dkt. No. 87 at 1); (Dkt.

No. 91 at 85).  During his incarceration, Griss apparently asked some friends and family

to stay at his home in Corpus Christi, Texas.  (*Id.*); (Def. Ex. 1 at 20:30–21:32).  That group

included Defendants Cervantes and Molina as well as Griss's cousin, Norma Ortiz.  (Dkt.

No. 87 at 1); (Def Ex. 1 at 20:30–21:32).  Around this time, the United States Marshals

Service received a tip that Molina was at Griss's home.  (Dkt. No. 91 at 28).  Molina was

a violent offender with multiple arrest warrants wanted by the U.S. Marshals Service's

Gulf Coast Violent Offenders Task Force.  (*Id.* at 22, 28–29, 38).  The Task Force sent two

U.S. Marshals to verify the tip.  (*Id.* at 29–30).

On June 19, 2020, at around 11:00 p.m., U.S. Marshals Deputies Christopher Porche

and Don Mihelich arrived at Griss's address.[4]  (*Id.* at 112).  They observed at least four

people coming and going from the house.[5]  Deputies Porche and Mihelich decided not to

---

[3]     The Court makes the following factual findings for the sole purpose of this Memorandum Opinion and Order.

[4]     Deputy Porche has been a U.S. Marshal for three years and had thirteen years of experience working in law enforcement prior to becoming a Marshal.  (Dkt. No. 91 at 22–23).  Deputy Mihelich has been a U.S. Marshal for twelve years and a Team Leader of the Gulf Coast Violent Offenders Fugitive Task Force for approximately two years.  (*Id.* at 110).

[5]     There is some disagreement as to the number of people that visited Griss's house that night.  Deputy Porche testified that he saw anywhere from four to six people.  (Dkt. No. 91 at 31).  Deputy Mihelich testified that he saw seven or eight people.  (*Id.* at 112).  The Defendants assert that there were only four people coming and going out of the house that night.  (Dkt. No. 94 at 3).  Although the Parties dispute the precise number, there appears to be consensus that there were at least four individuals.

arrest Molina because there were multiple people in the house, and it was too dark to confirm that Molina was present.  (*Id.* at 31).

Deputies Porche and Mihelich returned to Griss's address the next morning at around 11:30 a.m.  (*Id.* at 32).  They observed that Griss's home was a two-story residence with an attached front garage.  (*Id.* at 32–33); (Def. Ex. 3 at 1).  Deputies Porche and Mihelich also observed three vehicles parked in the driveway.  (Dkt. No. 91 at 33).  After surveilling Griss's home for about an hour, the Marshals saw the garage door open halfway to about five feet.  (*Id.* at 32–35, 63–64, 114–15).  Through this opening, Deputies Porche and Mihelich saw two shirtless men who appeared to be exercising in the garage.  (*Id.* at 34–36, 114).  According to the Marshals, these men had distinctive arm and torso tattoos.  (*Id.*).  The Marshals could not see the men's faces but based on their knowledge of Molina and his ties to the Texas Chicano Brotherhood gang, they believed Molina was one of the two men.[6]  (*Id.* at 35–36).  Deputies Porche and Mihelich could not identify the other male.  (*Id.* at 36).

The Marshals called for backup to arrest Molina.  (*Id.* at 37).  In total, 16 law enforcement officers from a variety of federal and state agencies responded to the scene.[7] (Dkt. No. 85 at 1–3).

---

[6]     Molina has a Texas Chicano Brotherhood tattoo on the right side of his torso that was visible to the Marshals.  (Dkt. No. 91 at 124, 126); (Def. Ex. 1 at 7:45).

[7]     In total, there were seven law enforcement officers from the U.S. Marshals Service, one from the Drug Enforcement Administration, two from the Texas Department of Public Safety, one from Homeland Security Investigations, three from the Nueces County Sheriff's Office, and two from the Corpus Christi Police Department Gang Unit.  (Dkt. No. 85 at 1–3).

A few minutes before 1:30 p.m., Molina exited the house and placed his son in the backseat of one of the cars in the driveway. (Dkt. No. 91 at 39, 51). Before Molina could get in the car, the Marshals approached him with weapons drawn and instructed him to place his hands behind his head and get on the ground. (*Id.* at 39). Molina complied. (*Id.* at 39, 60–61). The Marshals asked Molina if there were any other people in the house. (*Id.* at 39–40). Molina did not respond as he was focused on his son in the car. (*Id.*).

The Marshals knew that there was at least one other person in the house and feared that he was also a violent gang member. (*Id.* at 40, 85–86). Accordingly, they began to identify and secure everyone on Griss's property. (*Id.* at 40). The Marshals and their Task Force team announced themselves at the door of the house and instructed any occupants to come outside. (*Id.*). Cervantes and Ortiz exited out the front door and were placed in handcuffs. (*Id.* at 40–42); (Def. Ex. 1 at 1:28–2:08). After that, the Marshals initiated a sweep of the house. (Dkt. No. 91 at 41–42).

The sweep began at approximately 1:29 p.m. (*Id.* at 92–94). Task Force Officer Matthew Koenig[8] entered the home and went directly into the master bedroom where he spotted a walk-in closet. (*Id.* at 148). The closet was about six to seven feet long and had a "dog leg" to the left that extended about another three feet. (*Id.* at 148–50). Mindful that a person might be hiding there, Officer Koenig went into the closet and peered around the corner. (*Id.* at 149). He looked up and down to ensure there were no spaces

---

[8]   Officer Koenig works for the Texas Department of Criminal Justice Office of the Inspector General ("TDCJOIG") but has been assigned as a Task Force Officer to the U.S. Marshals for the last 10 years. (Dkt. No. 91 at 146). Officer Koenig has worked for TDCJOIG for 25 years and had 7 years of law enforcement experience prior to that. (*Id.* at 153).

where someone could be hiding.  (*Id.* at 152).  When he looked down, he saw an open backpack containing a baggie full of white powder and a scale.[9]  (*Id.*).  Upon making this observation at approximately 1:33 p.m., Officer Koenig radioed out to the rest of the Task Force that he spotted "a bag of dope in the closet."  (Dkt. No. 91 at 155, 163); (Def. Ex. 1 at 4:40).  When he exited the closet, other members of the Task Force pointed to a bag of marijuana on top of the dresser.[10]  (Dkt. No. 91 at 156).  The Task Force continued with the sweep.  *See* (*Id.* at 159).

Outside the house, other members of the Task Force were conducting a sweep of the backyard.  (Def. Ex. 2 at 0:24–5:58).  At approximately 1:34 p.m., Deputy Porche entered a utility shed to ensure that there was no one inside.  (Dkt. No. 91 at 80).  After opening the doors to the shed, Deputy Porche opened a metal case on a shelf.  (*Id.* at 80–82, 90–91); (Def. Ex. 2 at 5:33–5:48).  Deputy Porche did not find any items of note, closed the shed, and pronounced the backyard clear.  (Dkt. No. 91 at 90–91); (Def. Ex. 2 at 5:33–5:48).

Having found no one in Griss's home, the Task Force exited the residence.  The protective sweep inside the house concluded at approximately 1:35 p.m., roughly six minutes after it began.  *See* (Dkt. No. 91 at 43, 93, 163).

---

[9]    This backpack appears to be the only one found in the residence.  *See* (Dkt. No. 91 at 132, 137).  Any subsequent references to a backpack refer to this same bag.

[10]    It is unclear which officer initially saw the bag of marijuana on top of the dresser and at what time, but there is evidence indicating that more than one officer took note of the marijuana on the dresser at various times throughout the protective sweep.  *See* (Dkt. No. 91 at 142, 156).  Because it is unclear when the marijuana was first observed, the Court will use Officer Koenig's first encounter with the marijuana at 1:33 p.m.  The officer who told Officer Koenig about the marijuana likely saw the marijuana near the time Officer Koenig was in the closet.

While the sweep was taking place, other officers in front of the house worked to identify the two unknown individuals who had exited the residence after Molina's arrest. (Def. Ex. 1 at 11:22–25:57).  Cervantes and Ortiz provided their names, birthdates, and social security numbers but did not have identification.  (*Id.* at 18:34–21:32).  At approximately 1:38 p.m.—clearly after the sweep had ended—Deputy Mihelich asked Cervantes where his ID was; Cervantes replied that his ID was in a backpack inside the house. (Dkt. No. 91 at 99).  Deputy Mihelich went inside the house, and around 1:40 p.m., radioed that he had found "dope" in a backpack while searching for Cervantes's ID.  (*Id.* at 138–39); (Def. Ex. 1 at 11:42).  No ID was located.  (Dkt. No. 91 at 105).

Special Agent Rincon[11] entered the home 15 to 30 to thirty minutes later and went into the master bedroom to view the drugs observed during the sweep so that he could prepare a search warrant affidavit.[12]  (*Id.* at 168–69).  While in the master bedroom closet, Special Agent Rincon looked down into the backpack and saw a "baggie" with what he believed were white pills.[13]  (*Id.* at 169, 182).  He also saw the marijuana sitting in a clear bag on top of the dresser.  (*Id.* at 169–70).  Special Agent Rincon then left the house and called his supervisors to see if they wanted to pursue a narcotics case.  (*Id.* at 171).  About

---

[11]    Rincon works for the Texas Department of Public Safety and is a deputized agent on the Task Force.  (Dkt. No. 91 at 167).  He has been a special agent for the Criminal Investigation Division for one year.  (*Id.*).

[12]    The Marshals testified that their mission was solely to arrest Molina; therefore, they left the narcotics to the state officers on the Task Force.  (Dkt. No. 91 at 142, 158–59, 170–71).

[13]    During the initial hearing, Special Agent Rincon conceded that he was mistaken as to the contents of the backpack.  (Dkt. No. 91 at 187).  He believed at the time that he saw pills, but it turns out that it was powder cocaine.  (*Id.* at 182–83, 187).  Special Agent Rincon also did not see the scale in the backpack.  (*Id.* at 190–91).

20 minutes later, with supervisor approval, Special Agent Rincon left the scene to prepare and submit the affidavit.  (*Id.* at 172).  A magistrate in Nueces County issued a search warrant for Griss's home at 4:39 p.m.  (*Id.* at 172, 174); (Gov. Ex. 7).

Over three hours elapsed between the end of the Task Force's sweep of Griss's home and the issuance of the search warrant.  (Dkt. No. 91 at 43, 93, 163, 174–75).  With the search warrant in hand, the Task Force again searched Griss's house and the Government claims to have seized 505 grams of cocaine, 28 rounds of ammunition, pills, liquid vials, five cell phones, and marijuana.  (Dkt. No. 72 at 2).

### B.   PROCEDURAL HISTORY

On November 12, 2020, Defendants Griss, Molina, and Cervantes were indicted by a grand jury for conspiring to possess cocaine with intent to distribute.  (Dkt. No. 1).  In March and April 2021, the Defendants filed their Motions to Suppress.  (Dkt. No. 46); (Dkt. No. 53); (Dkt. No. 72).  The Government filed a collective Response in opposition. (Dkt. No. 73).  Supplemental briefing followed.  (Dkt. No. 87); (Dkt. No. 93); (Dkt. No. 95); (Dkt. No. 96).

The Court held an evidentiary hearing on May 13, 2021, which was reopened on July 8, 2021.  The Government presented testimony from Deputies Christopher Porche, Don Mihelich, and Chris Askew with the United States Marshals Service; Matthew Koenig with the Texas Department of Criminal Justice Office of the Inspector General; Special Agent Adrian Rincon Jr. with the Texas Department of Public Safety; and Officer Gus Perez with the Aransas Pass Police Department.  *See* (Dkt. No. 91 at 4).  The Defendants presented testimony from Alejandro Griss—Defendant Griss's father.  The

Government placed seven exhibits into evidence.  *See* (*Id.* at 5).  Six of these exhibits were photographs of the residence that was searched, and the seventh was the search warrant itself.  (*Id.*).  The Defendants placed three exhibits into evidence including the bodycam videos of Officers Danny Flores and Rudy Gonzales with the Nueces County Sheriff's Department and the affidavit in support of the search warrant application.  *See* (*Id.*); (Dkt. No. 89).

## II.    ANALYSIS

Griss, Molina, and Cervantes move to suppress the evidence obtained following Molina's arrest.[14]  In support, the Defendants offer three main arguments.[15]  First, the protective sweep of Griss's home was impermissible.  (Dkt. No. 46 at 1); (Dkt. No. 53 at 2–3); (Dkt. No. 72 at 2, 4); (Dkt. No. 87 at 2–4).  Second, even if the protective sweep was permissible, law enforcement exceeded the scope of that sweep.  (Dkt. No. 46 at 1); (Dkt. No. 53 at 2); (Dkt. No. 87 at 4–5).  Finally, the Defendants allege that the search warrant was defective.  (Dkt. No. 72 at 5–6); (Dkt. No. 87 at 5–7); (Dkt. No. 96 at 5–6).  The Government disagrees broadly arguing the protective sweep was justified under the

---

[14]    Specifically, the Defendants ask the Court to suppress all evidence, including statements, as fruit of the poisonous tree.  (Dkt. No. 46 at 1); (Dkt. No. 53 at 2–4); (Dkt. No. 72 at 2, 4–6); (Dkt. No. 87 at 8); (Dkt. No. 96 at 2, 6–7); (Dkt. No. 95 at 6–7).

[15]    A criminal defendant must have standing to suppress evidence.  *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).  The Government does not challenge the Defendants' standing.  *See, e.g.*, (Dkt. No. 87 at 1) ("[Griss] contacted his friends, Co-Defendants Cleofas Molina and Juan Cervantes, to take care of his house and car while he was in custody.  Both had Griss's permission to stay at the house.").  Regardless, Griss, as the homeowner, and Molina and Cervantes, who appear to be invited overnight guests, appear to have standing.  *See Minnesota v. Olson*, 495 U.S. 91, 98, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990) (concluding "society recognizes that a houseguest has a legitimate expectation of privacy in his host's home").

circumstances and all evidence was properly seized.  (Dkt. No. 73 at 9–12); (Dkt. No. 93).
The Court addresses each of these arguments in turn.

This case implicates the Fourth Amendment to the United States Constitution.  The
Fourth Amendment provides in full:

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and
> seizures, shall not be violated, and no Warrants shall issue,
> but upon probable cause, supported by Oath or affirmation,
> and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. amend. IV.  "As that text makes clear, the ultimate touchstone of the Fourth
Amendment is reasonableness." *Lange v. California*, ___ U.S. ___, ___, 141 S.Ct. 2011, 2017
(2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d
650 (2006) (internal quotations omitted)).

When law enforcement conducts an "unreasonable search" under the Fourth
Amendment, a court may suppress the unlawfully obtained evidence.  *United States v.
Mendez*, 885 F.3d 899, 909 (5th Cir. 2018).  But suppression is not "a necessary consequence
of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141, 129 S.Ct.
695, 700, 172 L.Ed.2d 496 (2009).  Rather, "the benefits of deterrence" associated with
suppression "must outweigh the costs." *Id.*  If the so-called "exclusionary rule" applies,
suppression is appropriate not only to "evidence uncovered as a direct result of the
violation, but also evidence indirectly derived from it—the so called 'fruit of the
poisonous tree.'" *Mendez*, 885 F.3d at 909 (quoting *Utah v. Strieff*, ___ U.S. ___, ___, 136
S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016)).

When the Government searches a person's home without a warrant, "it is the government's burden to bring the search within an exception to the warrant requirement." *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020) (quoting *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011)).   Here, law enforcement initially searched Griss's home without a warrant.   Therefore, the Government bears the burden of showing that the search was constitutional.[16]

### A.     THE PROTECTIVE SWEEP

The Court's inquiry begins with the Government's justification for the warrantless entry of Griss's home: a protective sweep.   The "very core" of the Fourth Amendment's guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, ___ U.S. ___, ___, 141 S.Ct. 1596, 1599, 209 L.Ed.2d 604 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 1414, 85 L.Ed.2d 495 (2013)).   As a result, law enforcement must generally obtain a warrant before entering a home without permission. *Lange*, ___ U.S. at ___, 141 S.Ct. at 2017.   If law enforcement enters a home without a warrant and without permission, that search is presumptively unreasonable. *Staggers*, 961 F.3d at 757; *United States v. Daniels*, 930 F.3d 393, 400 (5th Cir. 2019); *Kentucky v. King*, 563 U.S. 452, 459, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011).

Nonetheless, a protective sweep may justify a warrantless entry into a home. *See United States v. Silva*, 865 F.3d 238, 241 (5th Cir. 2017) (per curiam).   "A 'protective sweep'

---

[16]     The Government conceded during the suppression hearing that it carries the burden on the lawfulness of the protective sweep.   (Dkt. No. 91 at 10).

is a quick and limited search of premises, incident to an arrest and conducted to protect

the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093,

1094, 108 L.Ed.2d 276 (1990).  To determine whether a protective sweep is valid, a court

should consider whether:

> (1) the government agents have a legitimate law enforcement
> purpose for being in the house; (2) the sweep is supported by
> a reasonable, articulable suspicion that the area to be swept
> harbors an individual posing a danger to those on the scene;
> (3) the sweep is no more than a cursory inspection of those
> spaces where a person may be found; and (4) the sweep lasts
> no longer than is necessary to dispel the reasonable suspicion
> of danger and lasts no longer than the police are justified in
> remaining on the premises.

*United States v. Lim*, 897 F.3d 673, 688 (5th Cir. 2018) (quoting *United States v. Mendez*, 431

F.3d 420, 428 (5th Cir. 2005)).  A court should further "consider the totality of the

circumstances surrounding the officers' actions."  *Silva*, 865 F.3d at 241.  But the

protective-sweep inquiry is in no way an invitation to "second-guess the judgment of

experienced law enforcement officers concerning the risks in a particular situation" if

"reasonable minds could differ on whether the sweep was warranted."  *Id.* at 242.

### 1.    <u>Legitimate Purpose and Reasonable, Articulable Suspicion</u>

The first two considerations when examining a protective sweep are whether

(1) the Task Force had a legitimate law enforcement purpose for being in Griss's house;

and (2) the sweep is supported by a reasonable, articulable suspicion that Griss's house

harbored an individual who posed a danger.  *See Lim*, 897 F.3d at 688.  The Government

argues both considerations are satisfied, as Molina was (a) a violent gang member;

(b) subject to a high-priority U.S. Marshals initiative; and (c) observed alongside an

unidentified male with tattoos.  (Dkt. No. 73 at 9–10).  The Defendants, by contrast, argue that the Task Force could have completed Molina's arrest without entering the home, particularly since they argue that there was no threat of a person inside the home.  (Dkt. No. 87 at 2–3).  The Court agrees with the Government.

A "protective sweep of a suspect's house may be made 'even if the arrest is made near the door but outside the lodging' if the arresting officers 'have reasonable grounds to believe there are other persons present inside who might present a security risk.'" *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001) (quoting *United States v. Merritt*, 882 F.2d 916, 921 (5th Cir. 1989)).  Although Molina was arrested in the driveway of Griss's home, there were reasonable grounds to believe that another person was inside Griss's home who might present a security risk.  Hours before Molina's arrest, Deputies Porche and Mihelich observed at least one other person inside Griss's home: a tattooed man in the garage.  (Dkt. No. 91 at 36–37, 39–40).  Moreover, the Task Force was aware of Molina's violent past, gang affiliation, and tattoos.  (Dkt. No. 91 at 38, 85–88).  Thus, it was reasonable for the Task Force to believe that the unidentified man in Griss's garage might also have a violent past or gang affiliation.  Following Molina's arrest, the Task Force asked Molina whether anyone was in the house, but Molina did not answer.  (Dkt. No. 91 at 40, 88).  Cervantes then exited the house after being instructed to do so by law enforcement.  (Dkt. No. 91 at 40–41).  But Cervantes was accompanied by a woman the Task Force had not seen during prior surveillance.  (Dkt. No. 91 at 40–41).  This previously unaccounted for individual provided an additional reasonable basis for believing that there might be other people inside Griss's home.  Indeed, the night before the protective

sweep, the Task Force observed *at least* four individuals inside Griss's home.  (Dkt. No. 91 at 31, 37, 112, 116).  Considering there were only three individuals accounted for before the protective sweep, it was reasonable to infer that at least one other individual could still be inside and could be gang affiliated.  *See* (Dkt. No. 91 at 231–33).  The Court will not second-guess the judgment of experienced officers concerning the risks under these circumstances.  *See Silva*, 865 F.3d at 242.  The Court finds that the Task Force had a legitimate law enforcement purpose to enter the house and had reasonable grounds to believe there was at least one other person inside who might present a security risk.  *See Watson*, 273 F.3d at 603.

### 2.   Cursory Inspection

Next, the Court must consider whether the sweep was no more than a cursory inspection of those spaces where a person may be found.  *See Lim*, 897 F.3d at 688.  The Defendants argue that the Task Force made more than a cursory inspection because the Task Force searched a backpack without probable cause and opened a metal case in the utility shed where a person could not possibly have hidden.  (Dkt. No. 87 at 4–5); (Dkt. No. 95 at 3); (Dkt. No. 96 at 3).  In response, the Government argues that the narcotics were observed in plain view in the backpack and that the utility-shed search did not produce any evidence to suppress.  (Dkt. No. 93 at 2, 4, 12–13).

The Task Force first swept the entire two-story, 1700 square-foot home in approximately six minutes.  *See* (Dkt. No. 91 at 43, 93, 163).  The Task Force almost

exclusively searched in places where people could hide.[17]  (Dkt. No. 91 at 28, 110–11, 149,

152).  The Task Force then left the residence.  (*Id.* at 43, 163).

Despite this short timeframe, the Defendants argue that the Government exceeded

the scope of a "protective sweep" in two ways.  First, the Defendants assert that the Task

Force searched the backpack in Griss's closet without probable cause, (Dkt. No. 87 at 4–

5), however, no evidence was presented to this effect.  To the contrary, the record reflects

that the narcotics in the backpack were in plain view.[18]  (Dkt. No. 91 at 137–38, 152–54,

162–64, 169–70).

Second, the Defendants take issue with the manipulation of the metal case in the

utility shed during the protective sweep, arguing no person could have hidden inside.

The Government concedes that Deputy Porche exceeded the scope of the protective

sweep by manipulating the lid.  (Dkt. No.  93 at 2, 8).  The body cam video supports this

conclusion—no person could fit in the metal case.  (Dkt. No. 91 at 80–82).  Thus, the search

of the metal case was beyond the scope of a permissible protective sweep.  *See Silva*, 865

F.3d at 243.  But, crucially, Deputy Porche's impermissible search yielded no evidence.

Deputy Porche was outside the home when he opened the metal case, whereas all of the

incriminating evidence was found inside the home.  In fact, Deputy Porche's search of

the utility shed occurred about one minute *after* the Task Force observed narcotics in plain

---

[17]    The Defendants make much of the body camera audio where officers can be heard reminding each other to look for "secret compartments."  (Dkt. No. 87 at 1–2).  Given that secret compartments can be used to hide people, not just drugs, these statements do not demonstrate officers exceeded the scope of their sweep.

[18]    The Court discusses how the plain view doctrine is implicated by the evidence discovered during the protective sweep below.

view pursuant to the protective sweep.  *Compare* (Dkt. No. 91 at 159, 163); (Def. Ex. 1 at 4:40) *with* (Dkt. No. 91 at 79–81); (Def. Ex. 2 at 5:33–5:48).  Accordingly, there is no tainted evidence from the utility-shed search to suppress.  *Cf. United States v. Blevins*, 755 F.3d 312, 325 (5th Cir. 2014) (explaining "*evidence* recovered beyond the scope of the protective sweep is not" admissible (emphasis added)); *see also United States v. Williams*, 951 F.3d 892, 897 n.3 (8th Cir. 2020) ("Although the officers exceeded the scope of a protective sweep by looking in the microwave and kitchen cabinets, they seized no evidence from there.").

The Court finds that the sweep of the residence was no more than a cursory inspection of those spaces where a person may be found.  *See Lim*, 897 F.3d at 688.  The incriminating evidence discovered during the course of that protective sweep was in plain view.  The search of the metal case in the utility shed exceeded the scope of a protective sweep, however, there was no evidence discovered as a result.  Accordingly, while that search was illegal, it does not taint the lawful search that was occurring inside the house.

### 3.    No Longer Than Necessary

Finally, the Court must confirm that the sweep lasted no longer than necessary to dispel the reasonable suspicion of danger and lasted no longer than the police were justified in remaining on the premises.  *See Lim*, 897 F.3d at 688.  The Defendants argue that the sweep lasted longer than necessary because the Task Force re-entered the house at least twice over the course of three hours before obtaining a warrant.  (Dkt. No. 87 at 5); (Dkt. No. 95 at 3–5); (Dkt. No. 96 at 3–6).  The Government, acknowledging both re-

entries into Griss's home, argues that the first re-entry was justified to obtain ID and the second re-entry was justified because the home was a "crime scene." (Dkt. No. 93 at 2, 4–5, 12). The Government further argues that neither re-entry resulted in the discovery of narcotics. (*Id.* at 12–13). The Court finds that the protective sweep did not last longer than necessary.

The initial protective sweep was completed in less than seven minutes. (Dkt. No. 73 at 11); *see also* (Dkt. No. 91 at 43, 93). Following this protective sweep, law enforcement exited Griss's home. (Dkt. No. 91 at 43, 163). Later, Deputy Mihelich re-entered the home to search for Cervantes's ID.[19] When Deputy Mihelich re-entered the home to search for Cervantes's ID, the protective sweep had concluded.[20] *Compare* (Dkt. No. 91 at 43, 163) *with* (Def. Ex. 1 at 11:42). Cervantes informed law enforcement that his ID was in a backpack inside the house. (Dkt. No. 91 at 99, 134). Only one backpack was located. (*Id.* at 132–33, 137). This was the same backpack that had been seen in the closet during the protective sweep. (*Id.*). Although Deputy Mihelich entered the home and radioed out

_____

[19]    One possible theory is that Cervantes consented to entry of Griss's home to retrieve his ID. "The government does not need a warrant if it receives: (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent received." *Staggers*, 961 F.3d at 757 (citing *United States v. Freeman*, 482 F.3d 829, 831–32 (5th Cir. 2007)). After Deputy Mihelich asked Cervantes where his ID was, Cervantes explained that it was in a backpack inside Griss's home. (Dkt. No. 91 at 99, 134). But explaining that an item is inside a home is a far cry from voluntarily consenting to the officers' *entry* into the home to retrieve that item. Indeed, the Government concedes Deputy Mihelich re-entered the residence without consent to locate the ID in the backpack. (Dkt. No. 93 at 4). As the Court noted during the suppression hearing, it is undisputed that there was not consent. *See* (Dkt. No. 91 at 235).

[20]    The Government concedes that the protective sweep doctrine, by itself, does not afford law enforcement the ability to re-enter a home to look for an ID when the protective sweep is complete. *See* (Dkt. No. 91 at 209–10).

that he saw narcotics in the backpack, those were the same narcotics that had already been lawfully observed in plain view by Officer Koenig during the protective sweep. *Compare* (Dkt. No. 91 at 148–53); (Def. Ex. 1 at 4:40) *with* (Dkt. No. 91 at 99, 138–39); (Def. Ex. 1 at 11:42). As a result, Deputy Mihelich's re-entry into the house and search of the backpack does not retroactively taint the evidence he discovered that had already been seen in plain view.

After that, Special Agent Rincon entered the premises. Special Agent Rincon entered Griss's home to simply "observe" the narcotics himself in order to request a warrant from a state magistrate. (Def. Ex. 3); (Dkt. No. 91 at 168–72). Because the protective sweep had ended, Special Agent Rincon needed an exception to the warrant requirement to re-enter the house without a warrant. *See, e.g.*, *Bilida v. McCleod*, 211 F.3d 166, 172 (1st Cir. 2000) ("It is hard to see why a new entry, after the legally entering officer has left the premises and for a quite different purpose, should avoid the warrant requirement, absent some new exigent circumstance or other excuse for failing to get a warrant."); *cf. United States v. Delva*, 858 F.3d 135, 154 (2d Cir. 2017) (explaining that law enforcement must generally leave a home after completing a protective sweep "barring other exigencies"). But like Deputy Mihelich's re-entry, Special Agent Rincon's entry did not lead to the discovery of evidence. To the contrary, Special Agent Rincon went straight to the master bedroom where he observed the narcotics on the dresser as well as in the backpack in the master closet and then left Griss's home without touching anything. (Dkt. No. 91 at 168–71). As explained below, this evidence was first observed in plain

view and the additional evidence seized pursuant to the search warrant is otherwise subject to the independent source doctrine.

In sum, after considering the totality of circumstances, the Court concludes that the initial sweep of Griss's home was a valid protective sweep that was not invalidated by the search of the case in the utility shed, the re-entry after the protective sweep to search for the ID, or the re-entry to view the evidence already seen in order to swear off on a search warrant affidavit.

### B.   PLAIN VIEW EXCEPTION

The Government argues that the narcotics were observed in plain view during the protective sweep. (Dkt. No. 73 at 2, 5–6, 11); (Dkt. No. 93 at 2, 4–7, 12–13). The Defendants do not directly address the plain view exception, instead noting that members of the Task Force "claimed to observe" narcotics during the protective sweep. (Dkt. No. 53 at 2); (Dkt. No. 72 at 2). In fact, the gravamen of the Defendants' argument is that the evidence seen in plain view was during an illegal search to begin with. Since the Court has found that the Task Force officers were lawfully in the residence conducting a protective sweep, the Court concludes that the narcotics seen during the course of that sweep were lawfully observed in plain view.

Any "evidence or contraband seen in plain view during a lawful sweep can be seized and used in evidence at trial." *United States v. Garcia-Lopez*, 809 F.3d 834, 839 (5th Cir. 2016) (citing *United States v. Jackson*, 596 F.3d 236, 242 (5th Cir. 2010)). The plain view exception applies "where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was

18

'immediately apparent;' and (4) the police had a lawful right of access to the item." *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010) (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990)). "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *Id.* at 407 (quoting *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005)). "To have probable cause, it is not necessary that the officer know that the discovered res is contraband or evidence of a crime, but only that there be a practical, nontechnical probability that incriminating evidence is involved." *United States v. Turner*, 839 F.3d 429, 433 (5th Cir. 2016) (citations and quotations omitted). The Court finds that the narcotics at the center of this dispute were observed in plain view.

The first and fourth elements are satisfied because the Task Force lawfully entered the area where the narcotics were located, and the Task Force had a lawful right of access to the narcotics as part of a protective sweep. *See Watson*, 273 F.3d at 603. Entering the bedroom and closet under these circumstances was not beyond the scope of a lawful protective sweep because the Task Force had reasonable suspicion that a dangerous individual could be hiding there. *See Buie*, 494 U.S. at 334, 110 S.Ct. at 1098 (holding that a protective sweep beyond "closets and other spaces immediately adjoining the place of arrest" is permissible if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene").

The second and third elements—that the narcotics were in plain view and their criminal nature was "immediately apparent"—are also easily satisfied.  Officer Koenig personally observed the marijuana on top of the dresser, as well as the white powder he identified as narcotics in the backpack in the closet.  (Dkt. No. 91 at 152, 156, 159).  As the Defendants point out, (Dkt. No. 87 at 6), the term "marijuana" does not include "hemp." 21 U.S.C. § 802(16)(B)(i); 7 U.S.C. § 1639o(1).  But Koening was not required to be certain about the THC concentration of the substance on the dresser.  *See Turner*, 839 F.3d at 433. Probable cause is less demanding than certainty.  *See Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 1103, 188 L.Ed.2d 46 (2014) ("Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." (cleaned up)).  Moreover, Officer Koenig relied on more than just his observation of the marijuana on the dresser.  When sweeping the closet, Officer Koenig observed white powder in the backpack along with a scale.  (Dkt. No. 91 at 152). In Officer Koenig's professional opinion and based on his years of experience, the white power coupled with the nearby scale led him to believe that the backpack contained narcotics.  (*Id.* at 152–53).   These observations provided a "practical, nontechnical probability that incriminating evidence is involved."  *See Turner*, 839 F.3d at 433.  This, in turn, also supported Officer Koenig's belief that the leafy green substance in the same vicinity was also an illegal substance.

Having met all four requirements of the plain view exception, the Court concludes that the Task Force could have seized the narcotics during the protective sweep of Griss's home.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564

(1971) ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").

###### C.   INDEPENDENT SOURCE DOCTRINE

Although the Task Force could have immediately seized those narcotics without a warrant, it did not.  Instead, the Task Force completed the protective sweep, exited Griss's home, and requested that a state law enforcement officer re-enter Griss's home to personally observe the narcotics and obtain a warrant.  The Defendants make much of this order of events, arguing that the subsequent "viewing" of these drugs upon re-entry was unlawful.  (Dkt. No. 95 at 5); (Dkt. No. 96 at 5).  The Government responds that it did not discover evidence from the re-entry into the home.  (Dkt. No. 93 at 13).  Even if the subsequent viewing of the drugs upon re-entry was unlawful, the Court concludes the evidence should not be suppressed under the independent source doctrine.

"The independent source doctrine allows admission of evidence that has been *discovered* by means wholly independent of any constitutional violation."  *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (emphasis added).  The "rule applies to both evidence seen for the first time during the lawful search and evidence seen in plain view at the time of the warrantless search."  *United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009) (citing *Murray v. United States*, 487 U.S. 533, 541–42, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988)).  There is "a two-part analysis to determine whether the independent source rule applies[.]"  *Hearn*, 563 F.3d at 102.  First, "does the warrant affidavit, when purged of tainted information gained through the initial illegal entry,

contain sufficient remaining facts to constitute probable cause"? *Id.* (quoting *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996)).  Second, "did the illegal search affect or motivate the officers' decision to procure the search warrant"?  *Id.*

Regarding the first inquiry, there was no additional information gained through Special Agent Rincon's entry into Griss's home following the conclusion of the protective sweep.  The Task Force first lawfully discovered the narcotics in plain view during the protective sweep.  It was not until *later* that the Task Force re-entered Griss's home to re-observe the narcotics that were already discovered.  Therefore, there is no "tainted information gained through the initial illegal entry" that need be excised from the warrant affidavit.  *See Hassan*, 83 F.3d at 697.

Regarding the second inquiry, the re-entry did not affect or motivate the Task Force's decision to procure a warrant.  To the contrary, a state law enforcement officer entered Griss's home *after* the protective sweep to personally observe the narcotics that the Task Force had *previously* observed *during* the protective sweep.  Special Agent Rincon's motivation for obtaining a warrant was the Task Force's representation that narcotics were observed in plain view during the protective sweep.  Even without the subsequent re-entry into Griss's home, law enforcement could have obtained a warrant to search Griss's home.  *See United States v. Green*, No. 20-2796, 2021 WL 3573313, at *7 (8th Cir. Aug. 13, 2021) (holding that the officers had sufficient evidence to obtain a warrant even without the unlawful search).  To be sure, it is puzzling that Special Agent Rincon re-entered the house to personally view the narcotics that had been discovered in plain view when he simply could have relied on hearsay information from the Task Force

officers *who actually saw it*. *United States v. Huerra*, 884 F.3d 511, 516 (5th Cir. 2018) ("officers may submit warrant applications containing hearsay, including, of course, information provided by other officers." (quoting *Bennett v. City of Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989)); *accord Manton v. Strain*, 439 F. App'x 328, 330 (5th Cir. 2011) (per curiam) ("When preparing a warrant affidavit, an officer may rely upon information from other officers."). In fact, that is what should have occurred in this instance. It was unnecessary for Special Agent Rincon to re-enter the house to observe the narcotics firsthand. Whether it was because he decided to do so on his own or he was instructed to do so, he unnecessarily complicated the issues. But, under the independent source doctrine, evidence seized after the Task Force obtained a search warrant should not be suppressed. *See United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992) ("'[W]hile the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied' had the misconduct not occurred.") (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. at 2535).

***

In the end, there was no additional evidence discovered from the time the protective sweep concluded through the time the search warrant was executed. *See Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984) (applying the independent source doctrine when the illegal entry "did not contribute in any way to discovery of the evidence seized under the warrant"); *cf. Strieff*, ___ U.S. at ____, 136 S.Ct. at 2062 (characterizing *Segura* as applying "the independent source doctrine because the unlawful entry 'did not contribute in any way to discovery of the

evidence seized under the warrant'"). Rather, the evidence was discovered in plain view during the lawful protective sweep of the home—*before* the Task Force re-entered the home. To be sure, law enforcement obtained a warrant to seize that same evidence *after* the Task Force re-entered the home following the conclusion of the protective sweep. But to suppress evidence that was first observed in plain view during a lawful protective sweep would undermine the goal of the exclusionary rule, which "is to put the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *United States v. Zavala*, 541 F.3d 562, 578 (5th Cir. 2008) (quoting *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)).[21]

## III.   CONCLUSION

For the foregoing reasons, the Defendants' Motions to Suppress are **DENIED**.

It is SO ORDERED.

Signed on September 13, 2021.

DREW B. TIPTON
UNITED STATES DISTRICT JUDGE

---

[21]   Because the independent source doctrine applies, the Court need not consider the warrant and whether the good-faith exception applies. *See Jackson*, 596 F.3d at 240 ("Because of this alternate ground[] for denying the motion to suppress, we do not reach the merits of the good-faith exception argument."); *Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (declining to reach the merits of an argument that the second search was illegal because the district court properly concluded the evidence was admissible under the independent source doctrine).